## NEBRASKA CHILDREN'S HOME SOCIETY ET AL. V. STATE OF NEBRASKA.

FILED FEBRUARY 9, 1899.   No. 10330.

1. Contempt: DISOBEDIENCE OF ORDER. In a contempt proceeding based on the alleged violation of a judicial order, such order may be examined only with a view to ascertaining whether it was *coram judice*. No mere error or irregularity therein, or in the proceedings leading thereto, excuses its disobedience.

2. Habeas Corpus: DEFECTIVE PETITION. A writ of habeas corpus, allowed by competent authority, may not be disregarded because allowed on an insufficient petition. A writ so allowed is not therefore void.

3. ————: WRIT: To WHOM DIRECTED. Although our habeas corpus act requires a writ to be directed to the sheriff, where the person charged with an unlawful restraint is not an officer charged with the custody of lawful prisoners, still the court, or judge in vacation. who has jurisdiction of the proceeding, may, when such writ proves unavailing to produce the prisoner, require by order any party to the proceeding, who is shown to have control of the prisoner, to produce his body.

4. Contempt: PUNISHMENT: AUTHORITY. The power to punish for contempt is incident to every judicial tribunal, derived from its very constitution, without any express statutory aid, and may generally be exercised only by that tribunal whose order has been violated or proceedings interfered with.

5. ——: ——: Proceedings. Contempt proceedings may be puni-
tive merely, or they may be remedial, to compel obedience to an
order for the time resisted.

6. ——: ——: ——: Jurisdiction in Vacation. Without deter-
mining the power in such a case to conduct purely punitive pro-
ceedings, *held,* that a judge in vacation, vested by law with
jurisdiction to conduct certain proceedings, has the inherent
power, incident to that jurisdiction, to hear and determine pro-
ceedings for contempt for the purpose of enforcing his orders
in the principal matter.

7. ——: ——: Transfer of Cause. The power to punish for con-
tempt being restricted to the tribunal whose authority is defied,
it is not error for a judge, who within his authority has made
an order in vacation, to refuse to transfer to another judge for
hearing a proceeding in contempt based on the disobedience of
such order.

8. ——: ——: Information. If the terms of an information in
contempt clearly show that the act complained of was willful, the
information will not be held bad for the failure to use the word
"willful."

9. ——: ——: Arraignment Unnecessary. It is not necessary in
a contempt proceeding that the defendant be formally arraigned.

10. ——: ——: Procedure. Where a contempt proceeding is in-
stituted by information and a rule to show cause, it is the duty
of the defendant to file an answer if he desires to traverse the
facts charged. Failing on sufficient opportunity to so do, the
court may treat the facts alleged in the information as con-
fessed.

11. ——: ——: Fine and Imprisonment. Where the object of a
contempt proceeding is to compel obedience to an order which
may still be obeyed, it is not error to sentence the defendant
to imprisonment until he shall obey such order, and in addition
to impose a reasonable fine for past disobedience.

Error to the district court for Douglas county. Tried
below before Scott, J. *Affirmed.*

*Montgomery & Hall,* for plaintiffs in error:

The petition for the writ in the habeas corpus proceed-
ing was insufficient. (Church, Habeas Corpus secs. 89, 90,
112; *Ex parte Nye,* 8 Kan. 99; *State v. Ensign,* 13 Neb. 250.)

Even if the district judge was authorized to enter the
order for the production of the children, he had no power
to proceed in vacation to attach and punish the plaintiffs

as for contempt of court. (*Ellis v. Karl*, 7 Neb. 381;
*Browne v. Edwards*, 44 Neb. 361; *Fisk v. Thorp*, 51 Neb. 1;
*Hodgin v. Whitcomb*, 51 Neb. 619; *Larco v. Casaneuava*, 30
Cal. 564; Rapalje, Contempt-sec. 8; *Johnson v. Bouton*, 35
Neb. 898; *Taylor v. Moffatt*, 2 Blackf. [Ind.] 305; *Gates v.
M'Daniel*, 3 Port. [Ala.] 356; *Oregon v. McKinnon*, 8 Ore.
488; *State v. Stevens*, 19 Pac. Rep. [Kan.] 367.)

The district judge erred in overruling the demurrer to
the information. (*Gandy v. State*, 13 Neb. 445; *Boyd v.
State*, 19 Neb. 128; *Ludden v. State*, 31 Neb. 429; *Cooley v.
State*, 46 Neb. 603; *Beckett v. State*, 49 Neb. 210; *Hawthorne,
v. State*, 45 Neb. 871; *Hawes v. State*, 46 Neb. 149.)

Arraignment is necessary. (*Zimmerman v. State*, 46
Neb. 13; *Boyd v. State*, 19 Neb. 128.)

*A. S. Churchill, contra.*

Irvine, C.

June 20, 1898, there was presented to the Hon. Cunning-
ham R. Scott, one of the judges of the fourth judicial dis-
trict, an application for a writ of habeas corpus. The
application was made in Douglas county, and apparently
while the district court of that county was in vacation.
The application was by Benjamin F. Dodd and Annie E.
Dodd, his wife, and was based on the unlawful restraint
of four minor children of the petitioners by the Nebraska
Children's Home Society, a corporation, and Elmer P.
Quivey, its superintendent. Judge Scott allowed the
writ, which accordingly issued. The sheriff returned that
he had made service of the writ upon the society and upon
Quivey; that he had demanded the children and had met
with refusal; that they were not found. The respondents
answered, admitting that they had had the custody of
the children, but alleging that they no longer had such
custody. This return was on motion quashed, apparently
for the reason that it failed to comply with that portion
of section 371 of the Criminal Code, which requires the
respondent, if he has had the party in his custody or

power, or under restraint, and has transferred such custody or restraint to another, to "state particularly to whom, at what time, for what cause, and by what authority such transfer was made." Thereupon an amended return was filed, which was deficient in the same respect, and was stricken from the files. Then the judge made an order reciting the proceedings, and requiring the respondents directly, at a time and place fixed, to produce the bodies of the children before the judge. They failing to do so, the present proceeding was begun by information against the Nebraska Children's Home Society, Louis D. Holmes, and Elmer P. Quivey, charging them with contempt of court in refusing to obey the order. A rule to show cause was made by the judge, and proceedings were had thereon which resulted in adjudging the defendants guilty, fining Holmes and Quivey each $200, and sentencing them to be confined in jail until they should produce the bodies of the children. The three defendants, by separate petitions in error, bring the case here for review.

In addition to the foregoing statement it may be said that the Nebraska Children's Home Society is a corporation whose object seems to be to obtain by contract the custody of children from their parents and the providing for them of homes elsewhere by contracts of adoption; that the Dodds had undertaken by contract to so part with their children, and the object of the habeas corpus proceedings was to test the binding force of these contracts. In the voluminous briefs presented many questions are argued. These fall into three classes: First, questions relating to the validity of the habeas corpus proceedings; second, questions relating to the power of the judge in the contempt proceedings; third, questions relating to the regularity of the contempt proceedings.

Preliminary to a discussion of the first group of questions it may be said that the proceedings in the habeas corpus case are open to examination here only so far as to ascertain whether the judge in those proceedings was acting within his jurisdiction. If not, his orders were

void, and no contempt could be committed by disregarding them. If, however, the order violated was one which the judge had authority to make, then the propriety of his making it, or the regularity of the proceedings leading up thereto, do not now concern us. No matter how erroneous that order may have been, no matter how irregular the proceedings leading thereto, such errors or irregularities cannot be urged as a defense or in extenuation of the violation of the order. The foregoing is a statement of law which has become elementary, and is rendered necessary only by the fact that counsel on both sides have seen fit to discuss at some length the question of the validity of the contracts out of which the habeas corpus proceedings grew, and other questions manifestly going only to the regularity and not to the validity of those proceedings.

It is charged that the application for a writ of habeas corpus was insufficient to authorize the judge to allow the writ. While the application in such case is the initiative proceeding, the validity of the writ does not depend on the sufficiency of the application. The issue of the writ is a judicial act. Where the application is in all respects sufficient, it is the duty of the judge to allow the writ; but it does not follow that the writ is void and can be disregarded if the judge, through mistake of law or from other cause, sees fit to allow it on an informal or insufficient petition. It has been held that the proper method of attacking the petition is by motion to quash the writ, and that insufficiency in the petition is waived unless that remedy be resorted to. (*McGlennan v. Margowski*, 90 Ind. 150.) It follows that a defective petition is not, therefore, fatal to the jurisdiction. We need not enter into an extended discussion of the nature of the writ of habeas corpus and the uniform policy of constitution, statutes, and decisions, to render it absolutely effective as a safeguard against unlawful restraint of the person. But, aside from mere technical considerations, a moment's attention to the subjects indicated must con-

53

vince one that when a judge sees fit to allow a writ it must be obeyed or resistance thereto made in the regular manner. Neither ministerial officer nor private citizen can be permitted to ignore its mandate because he may think the judge allowed it on insufficient grounds.

It is not seriously contended that the power to allow the writ of habeas corpus, to conduct a hearing, and adjudicate the rights of the prisoner are not vested in a judge in vacation. But it is strenuously argued that the particular order, the disobedience of which is charged in the information for contempt, was of such a nature that it could not be made by a court, and was especially beyond the powers of a judge in vacation. On this question we are favored by counsel for the defendant in error with an elaborate discussion of the history of habeas corpus as a common-law writ and under the statute of Charles II, coupled with an able argument to show that by virtue of acts of congress the common-law powers of judges with regard thereto were carried into the territory of Nebraska, and that the writ and procedure thereunder, according to English practice, were thereby recognized and perpetuated by the state constitution. To decide the question before us we do not find it necessary to examine into the soundness of this argument in its details and to its full extent. It is true that in the habeas corpus act of the territory of Nebraska, substantially preserved still in chapter 34 of the Criminal Code, there is no express warrant for such orders as Judge Scott made in this case. Section 367 of the Criminal Code, being a portion of the chapter cited, prescribes the form of the writ in case of detention by persons not being officers charged with the custody of prisoners, and the writ thereby prescribed runs to the sheriff, commanding him to bring the body of the person in question before the judge, and to summon the person charged as detaining the prisoner to appear and show cause for the taking and detention. Such was the form of the writ in this case, and by recurrence to the statement with reference to the sheriff's return it will be

found that the writ proved unavailing, through the ina-
bility of the sheriff to find the children and the refusal
of the respondents to produce them.   It certainly never
could have been the intention of the legislature to de-
prive a court of all power to require the production of the
prisoner except through the writ provided for in the sec-
tion cited.   An essential element of the remedy by habeas
corpus is the power to compel the production of the
body of the prisoner before the judge.   It is this very
feature which is embodied in the distinctive words which
give the name to the writ.   And while in certain cases
courts have proceeded, generally by agreement of those
concerned, without the actual production of the prisoner,
this has always been because such production would be
inconvenient, and the case was so shaped that the court
was assured that its order would be effective in the ab-
sence of the prisoner.   The existence of such cases is no
argument whatever against the power of the court to
compel the production of the prisoner before proceeding.
The statute provided, in the cases named, that the writ
should be directed to the sheriff, commanding him to
bring the prisoner before the court, not for the purpose
of preventing other means of compelling production, but
for the purpose of providing an additional means which
might generally be more effective than a writ directed to
the person charged with the unlawful detention.   We
have not the slightest doubt that where the original writ
fails to bring the prisoner before the court, the court may
make such further orders against parties to the proceed-
ing as will lead to the performance of that usually vital
prerequisite to an examination and an effective final or-
der in the case; and as the power to allow, hear, and de-
termine writs of habeas corpus is vested in district judges
in vacation, the power to make appropriate orders for
the production of the prisoner necessarily rests as well
in such judges as in the court in term time.   The order
made was, therefore, one which the judge had power to
make, and in a proceeding whereof he had jurisdiction,

and all matters relating merely to the propriety of its making must, for the purposes of this case, be disregarded.

The next group of questions relates to the power of the judge in the contempt proceedings. As to this, the argument is that a judge in vacation possesses only such powers as are expressly conferred upon him by law. All implied powers are excluded; and although a judge in vacation may allow a writ of habeas corpus, hear and determine the same, he may not in vacation punish for contempts occurring in the course of those proceedings. It is true that this court has frequently held, and such is the law generally, that a judge in vacation is confined to those powers expressly conferred upon him; but this does not mean that all the minutiæ of the exercise of general powers conferred must also be expressly granted. *People v. Brennan*, 45 Barb. [N. Y.] 344, *Taylor v. Moffatt*, 2 Blackf. [Ind.] 305, and *Gates v. M'Daniel*, 3 Port. [Ala.] 356, in a general way, support the argument of plaintiffs in error, although those cases are open to criticisms and distinctions, which, however, we do not deem it of sufficient importance to here point out. Some cases hold that a judge in vacation may not punish as a contempt the disobedience of an order made in term time, and many cases on the subject are based on the construction of statutes not here existing. We conceive that the principles governing the question are, after all, simple and not difficult of application. Contempts are punished by that tribunal, and that one alone, whose order is violated or whose proceedings are interrupted. The effect may well be, although this we do not determine, that an order made by the court must be protected by the court, and its violation cannot be punished by a judge in chambers. It also is clear that proceedings in contempt have, or may have, a double object. They may be punitive, to vindicate the authority of the court or judge, and inflict exemplary punishment. They may also be remedial, not so much to punish a past violation of the court's orders as to compel

obedience to an order for the time being resisted. More particularly to the latter class belongs the proceeding we are now examining. As has already been said, there can be no doubt of the power, and the duty, when occasion demands, of a judge in vacation allowing, hearing, and determining a writ of habeas corpus; but that power would be nugatory were he not also vested with the power to compel obedience to such preliminary orders as may be necessary for the purpose of enabling him to exercise the power granted. Authority to allow, hear, and determine a writ of habeas corpus is vested in a judge at chambers, because the remedy is of a summary character which is to be administered without delay. And it never was intended, and never could have been intended, that this prime object should be defeated through the inability of a judge in chambers to compel obedience to his orders. The foregoing views are supported by *Cobb v. Black*, 34 Ga. 162, and *Harmon v. Wagener*, 33 S. Car. 487.

Attention is called to section 356 of the Criminal Code, which makes it the duty of witnesses subpœnaed in habeas corpus cases to attend and give evidence on penalty of being guilty of contempt, and to "be proceeded against accordingly by said judge or court." It is argued that the expression of the power to proceed against witnesses operates as an exclusion of power to punish other contempts. But the section applies as well to the court as to the judge, and the argument would go so far, if sound, as to deny even to the court all other power to compel obedience to orders in habeas corpus cases. We think this section was inserted to extend, or at least to declare, the power of the court or judge to punish witnesses for contempt. It was not intended to make witnesses alone punishable, and to permit the disobedience of orders more necessary than subpœnas to go unpunished. We are also cited to *Johnson v. Bouton*, 35 Neb. 898, where section 669 of the Code of Civil Procedure, conferring upon "every court of record" power to punish for contempt in certain cases, is cited, and certain language used from which it

perhaps might be inferred that that section was deemed exclusive, and that it restricts the power to punish for contempt to courts as contradistinguished from judges. That the language used was not so intended is evident from the fact that the contempt charged in that case was the violation of an injunction, and that by the express provisions of section 260 of the Code of Civil Procedure "Disobedience of an injunction may be punished as a contempt by the court, or by any judge who might have granted it in vacation." What was decided in *Johnson v. Bouton* was that where a county judge, under circum- stances permitting him to do so, allows a temporary in- junction, it does not become effective until an approved bond is filed in the district court; that the injunction is the process of the district court and not of the county judge; that his jurisdiction ceases on his allowing the injunction, and that he may not punish its violation. As against any inference which might be drawn from the language referred to in that case, several decisions may be cited. *Kregel v. Bartling*, 23 Neb. 848, held dis- tinctly that "the power to punish for contempt is incident to every judicial tribune, derived from its very constitu- tion, without any expressed statutory aid." In *Dogge v. State*, 21 Neb. 272, it was held, without reference to any specific statutory authority, that a notary public has power to commit for contempt a witness who refuses to give his deposition; and in *Rosewater v. Pinzenscham*, 38 Neb. 835, the court, speaking of certain actions of the board of fire and police commissioners of Omaha, on the hearing of an application for a liquor license, said: "Doubtless, this arose from the belief that the license board had no authority either to enforce the production of the books or to punish witnesses as for contempt for their refusal to testify. This court is, however, unani- mously of the opinion that the board possessed such power. The proposition is too plain to require discussion or the citation of authorities in support thereof." From the foregoing it may be seen that it is the general rule

that where any officer or any tribunal has authority to hear and determine, such authority carries with it the necessary power to render it effective by contempt proceedings, especially so far as the latter are remedial in their nature. It is not, strictly speaking, implied power; it is an inherent power, essentially connected with the main purpose of the tribunal.

It is next argued, whatever may be the circumstances as to the society and Quivey, who were respondents in the habeas corpus case, that Holmes was not subject to proceedings for contempt, because he was not a party thereto. The society is a corporation. The information charges, and the proof shows, that Holmes was president thereof; that the writ of habeas corpus was served on him. .The information also charges that the children are within the power and control of the society, and that Holmes, as president, has power and control over the affairs of the corporation. While a corporation is in itself amenable to punishment for contempt, it cannot be imprisoned, and frequently can be coerced only through its officers; and where a corporation disobeys a judicial order, as a general rule, not only may the corporation be proceeded against, but those of its officers who, knowing of the order, participate in its violation are also guilty of contempt. (*Sercomb v. Catlin*, 21 N. E. Rep. [Ill.] 606; *First Congregational Church v. City of Muscatine*, 2 Ia. 69.) *Boyd v. State*, 19 Neb. 128, is cited on behalf of Holmes; but in that case, which was for violating an injunction, the injunction was against certain contractors with the city, and the contempt proceedings were against Boyd, who, as mayor of the city, was charged with its violation. The court held that the injunction restrained only the defendant, and those designated in the order in subordination to the defendant. That the court did not intend to hold, and did not hold, that officers of a corporation were not guilty of contempt in violating orders directed to the corporation is apparent from the following language: "Had the plaintiff in the original case desired to bind the

city and its officers, as well as the contractors, by his proceedings in injunction, he should have made the city a party to this suit."

We are thus brought to those questions affecting the regularity of the contempt proceedings. An application was made to Judge Scott to transfer the matter for hearing to some other judge. This application was based on the alleged prejudice of Judge Scott against the respondents and their attorney. We need not review the showing made on this motion, which Judge Scott overruled. Generally speaking, a contempt may only be inquired into and punished by the tribunal whose process or proceedings have been invaded. No court can punish for contempt of another court. (Rapalje, Contempt sec. 13.) We have no statute authorizing a transfer in such cases, and even general statutes relating to changes of venue have usually been held not to apply to contempt proceedings. (Rapalje, Contempt sec. 110.) The proceeding was not before the district court of Douglas county. It was before Judge Scott in chambers. Whatever might have been the propriety of transferring the case to another judge, were the proceeding one for violating the order of the court, and whatever might have been the propriety, even under the present circumstances, of Judge Scott's requesting another judge to take up the proceedings, were he conscious of any impropriety in himself conducting them, we are satisfied that it cannot be error for a judge to refuse to transfer to another judge for hearing a proceeding in contempt where the contempt charged is the violation of his own order made in chambers.

The sufficiency of the information is attacked, and counsel invoke the well-known rule that an information in contempt must charge the offense with all the particularity required of a criminal information. The point chiefly made is that the information does not charge the willful disobedience of the order. The information is quite long, and we shall not set it out in full. It is true the word "willful" is not used, but the facts are stated with such

particularity and in such a manner as to clearly charge a willful disobedience.

It is charged that the defendants were put upon trial without an arraignment. No authority is cited, nor do we think that any can be found, to the effect that a formal arraignment is necessary in such a proceeding.

The respondents demurred to the information, and the demurrers were overruled. The bill of exceptions shows that thereupon Mr. Churchill, representing the state, said: "Counsel for the defendants inform me they do not intend to file any pleadings showing why they should not be punished for contempt. If I understand correctly, the information stands confessed then." The judge said: "Yes, I think that is the rule." The respondents seem to have said nothing. Thereupon Mr. Churchill proceeded to offer certain evidence. In view of his position and that of the judge, this was unnecessary; but the evidence was not objected to on that ground and no question is made here of its admission. Then the respondents undertook to introduce evidence on their own behalf, and were met by an objection on the ground that they had made no showing in defense, and were not entitled to make any proof. Mr. Montgomery, for the respondents, said: "I desire to state of record in response to the remark of counsel for the plaintiff, that the defendants stand upon their demurrer, that such is not the attitude of the defendants at all. We simply stand upon our right to proper proceedings and proper trial of the matter whenever it is proper to have a trial, and the right to make our defense in the usual manner, or in such manner as may be proper and lawful." No application was made for leave to answer. No answer was tendered. Repeated offers of evidence were made, but all were excluded on the same objection, that there was no issue before the court, the information standing confessed. It may be said of the evidence offered that, with a single exception, it all went to the supposed want of authority of the judge to proceed, and related to matters the value and benefit

of which has been accorded defendants in this opinion. The exception referred to was the articles of incorporation of the society, by one provision of which the control of its affairs was vested in a board of directors. This was evidence tending to exculpate Holmes by disproving that averment in the information which charged that he had control of the affairs of the society. If, in the condition of the record, the defendants were entitled to introduce evidence, it was therefore error to exclude those articles of incorporation at least. We are largely without guidance on the question of procedure so presented. The old chancery practice in contempt has never been strictly followed in this state. In *Gandy v. State*, 13 Neb. 445, it was said, quoting from *Rex v. Lyme Regis*, 1 Doug. [Eng.] 149, that the purpose of requiring an information is to inform the court and "to apprise the opposite party of what is meant to be proved, in order to give him an opportunity to answer or traverse it." And further in the opinion it is said: "The proceeding against the party for constructive contempt must be commenced by an information under oath, specifically stating the facts complained of. An attachment may then be issued, or order to show cause. The person accused has the right to be heard, either personally or by attorney. If the alleged contempt is admitted, the court may render judgment thereon. If the acts complained of are denied, the court should then hear the evidence and determine whether the party is guilty or not." (*Gandy v. State*, 13 Neb. 445.) While this language was largely *obiter*, it was used evidently for the purpose of removing uncertainty and pointing out the regular and orderly procedure. The case was decided in 1882, and has undoubtedly been accepted as a guide in many cases. We are not inclined to depart from the suggestions there made. Here a rule to show cause was issued. The defendants demurred to the information; their demurrer was unsuccessful. It then became their duty to show cause—that is, to present an answer which, by traverse or otherwise, would meet the charge

Nebraska Children's ·Home Society v. State.

of the information.  They had ample notice, through the statements of counsel and of the court, that, failing to do so, the information would be taken as admitted.  Had they, after that statement of the judge, tendered an answer, he should, and doubtless would, have permitted it to be filed.  Instead thereof, they assumed an apparently defiant attitude and practically told the judge they were resting on their rights and not seeking to interpose a defense to the merits.  We think the judge was correct in holding that by failing to answer they confessed the information and tendered no issue, and he properly, therefore, refused to receive evidence.

Finally, it is contended that the sentence imposed was improper, both as to the amount of the fine and the unlimited imprisonment inflicted.  We think that the extent of the punishment, certainly within reasonable limits, rested in the discretion of the trial judge, and certainly cannot see that the fine was exorbitant.  As to the imprisonment, it was for just as long or just as short a time as the defendants themselves saw fit to make it. It was until they should comply with the order of the judge which they had been convicted of violating.  It was charged that it was in their power to comply.  They did not by answer, or even by any evidence which they sought to introduce, attempt to show that obedience was not within their power.  The proceeding being of a class which we have characterized as remedial, the imprisonment might properly be made to endure as long as the contempt.

AFFIRMED.

HARRISON, C. J., not sitting.